NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11729

COMMONWEALTH vs. ELDRICK BROOM.

Suffolk.     February 12, 2016. - June 13, 2016.

Present: Gants, C.J., Spina, Botsford, Duffly, & Lenk, JJ.


Homicide. Cellular Telephone. Probable Cause. Constitutional
    Law, Search and seizure, Probable cause, Retroactivity of
    judicial holding, Harmless error. Search and Seizure,
    Warrant, Probable cause. Error, Harmless. Jury and
    Jurors. Practice, Criminal, Capital case, Retroactivity of
    judicial holding, Warrant, Harmless error, Jury and jurors,
    Question by jury.



    Indictments found and returned in the Superior Court
Department on January 31, 2012.

    A pretrial motion to suppress evidence was heard by Janet
L. Sanders, J., and the cases were tried before Jeffrey A.
Locke, J.


    Elizabeth Caddick for the defendant.
    Cailin M. Campbell, Assistant District Attorney, for the
Commonwealth.


    BOTSFORD, J. Eldrick Broom, the defendant, stands

convicted of the murder in the first degree of Rosanna Camilo

DeNunez, on the theories of extreme atrocity or cruelty and

felony-murder with aggravated rape as the predicate felony.[1]  We

consider here the defendant's appeal from his convictions, and

affirm.

Background.  We summarize the facts that the jury could

have found.  In 2010, the victim, who was from the Dominican

Republic and the mother of three children, moved to New Jersey

with her newborn baby, Thiago.  Shortly thereafter, she

relocated to Boston to seek medical treatment for Thiago.

Although in July of 2011, the victim's sixteen year old

daughter, Navila, joined her mother to help her take care of

Thiago, the victim's husband of seventeen years and her other

son remained in the Dominican Republic.  By the time Navila came

to Boston, the victim was living in an apartment on Fairlawn

Avenue in the Mattapan section of Boston.   In the spring,

summer, and early fall of 2011, the defendant lived in an

apartment across the hall from the victim.  The defendant was

living with his fiancée and their children.

The victim spoke very little English, and interacted in a

substantive way only with her family members and the medical

professionals who were providing services to Thiago.  The victim

sometimes left her keys in her apartment door at the Fairlawn

Avenue apartment, and on three different occasions before the

---

[1] The defendant was sentenced to life in prison without the possibility of parole on the murder conviction.  His conviction of aggravated rape was placed on file.

day she was killed, the defendant knocked on the door and returned the keys to her. Navila had never seen her mother and the defendant interact, except for the times he returned the keys and when they exchanged polite greetings as he passed them in the hall. At the end of October, 2011, the defendant and his fiancée, who was pregnant, moved to an apartment on Bismarck Street, which was part of the same apartment complex as the Fairlawn Avenue building. Despite the move, the defendant sometimes returned to the steps of the Fairlawn Avenue building to smoke marijuana at his "normal spot."

During the afternoon of Sunday, November 20, 2011, Navila and the victim used the online Skype program[2] to talk with family members in the Dominican Republic. Thereafter, Navila, the victim, and Thiago went grocery shopping. When they returned to their apartment around 8 P.M., the defendant was on the front steps of the building. He helped them carry Thiago's carriage and the grocery bags up the steps, but did not enter the building. The family spent the evening alone together. At around 9 P.M., the victim put Thiago to bed. When Navila went to bed at around 10:30 P.M., she remained awake for the next one-half hour. The victim was in the living room using her

---

[2] Skype is "a proprietary [I]nternet-based computer software system that provides two-way visual and voice communication." E.C.O. v. Compton, 464 Mass. 558, 559 n.5 (2013), quoting Rivera v. State, 381 S.W.3d 710, 711 n.2 (Tex. Ct. App. 2012).

computer. The bedroom door was open, and Navila heard no unusual sounds. The victim, Navila, and Thiago all slept in the same bedroom. The next morning, November 21, 2011, the victim was asleep in her bed when Navila left for school.

When Navila came home from school at around 2:40 P.M. that day, she found her mother dead on the floor in a bedroom other than the one in which the family slept. The victim was naked from the waist down, her shirt was pulled up around her neck, her bra was pulled down with her left breast exposed, a pair of blue jeans and a blue shirt were lodged underneath her body, and the blue jeans were turned inside out. Two socks and a universal serial bus (USB) cord were tied around the victim's neck; the cause of death was strangulation. The victim's cellular telephone, keys, and underwear were missing.

Navila identified the defendant through a photograph as the only neighbor she ever saw interact with her mother. The police visited the defendant's apartment and spoke to him on November 29. During the interview, which was recorded with his permission, the defendant voluntarily provided the police with a buccal swab. At that time, the defendant said nothing in that interview about any sexual relationship with the victim.

During the initial investigation of the crime scene on November 21, swabs were collected from the jeans and shirt that had been under the victim's body as well as the socks and USB

cable from around her neck.  Testing performed on swabs collected from the victim's body during an autopsy and on the samples taken from the other items revealed that the defendant's deoxyribonucleic acid (DNA) was included as being a possible contributor to DNA found on the anorectal swabs taken from the victim,[3] as well as DNA found on stains on her jeans,[4] and her shirt.[5]  Based on the Y-chromosome short tandem repeat (Y-STR) testing of a sample taken from the socks that had been used as a ligature, the defendant could not be excluded as a contributor to the mixture.[6]

---

[3] Approximately one in 17 quadrillion Caucasians, one in 1.1 quadrillion African-Americans, and one in 230 trillion Southeastern Hispanics are included as being a possible contributor of deoxyribonucleic acid (DNA) to the mixture detected in the sperm fraction of the anorectal swab.

[4] The statistical probability of the defendant's being included as a possible contributor of DNA to the single source sample found in the sperm fraction of the stain from the blue jeans was approximately one in 3 sextillion Caucasians, one in 220 quintillion African-Americans, and one in 1.4 quintillion Southeastern Hispanics.

[5] Approximately one in 8.6 quadrillion Caucasians, one in 740 trillion African-Americans, and one in 110 trillion Southeastern Hispanics are included as being a possible contributor of DNA to the mixture in the sperm fraction of the stain from the shirt.

[6] The statistical analysis based on the database consisting of 11,393 males and thirteen different population groups showed that the partial mixture profile was seen 266 times in 1,932 African-American males, 1,162 times in 4,114 Caucasian males, 405 times in 1,601 Hispanic males, and 2,275 times out of the total database of 11,393 males.

Cellular site location information (CSLI) associated with the defendant's cellular telephone number for the period from November 1 to December 1, 2011, revealed that on November 21, 2011, the defendant's cellular telephone activated a cell tower located on Clare Avenue in the Roslindale section of Boston at 11:45 A.M. and 3:33 P.M. No CSLI or telephone activity was generated between 12:22 P.M. and 3:33 P.M. The police obtained the defendant's cellular telephone call detail records of text messages from October 5, 2011, to December 7, 2011, and voice calls from October 1, 2011, to December 4, 2011. The victim's telephone number never appeared in any of the defendant's records.

The police also obtained records for the victim's cellular telephone number from November 18 through 23. The defendant's telephone number was not listed in the call logs associated with the victim's number. The records for November 21 revealed that the victim's voice mail was checked at 10:07 A.M. and 11:15 A.M., and an outgoing call was made at 11:15 A.M.[7] An incoming call at 12:48 P.M. went to voice mail. The records reflect no cellular tower activity thereafter, meaning that the victim's cellular telephone was disabled in some way rendering it

---

[7] There was evidence presented at the trial that a licensed social worker who worked with Thiago spoke with the victim at 11:15 A.M. to confirm Thiago's appointment with an occupational therapist later that day.

inoperable. The occupational therapist who worked with Thiago called the victim's cellular telephone on November 21 at 1:18 P.M. and 1:39 P.M., but received no answer. The victim's computer was last used at 11:17 A.M. that day.

The defendant testified at trial. He stated that he began noticing the victim beginning in June, 2011, found her keys in her door and returned them a few times. When he ran into her in the laundry room, he would give compliments and flirt with her. Sometime in October, the flirtation in the laundry room led to a consensual sexual encounter in her apartment where he performed oral sex on her. He had an additional oral sexual encounter with the victim in her apartment before he moved to Bismarck Street. According to the defendant, his last sexual encounter with the victim occurred on November 20, the night before the murder. He observed the victim outside the apartment building with her children at around 8:30 to 8:40 P.M. and helped them with the stroller. He asked the victim if he could speak to her, but she did not say anything. Approximately ten to fifteen minutes later, he went inside the building and knocked on the victim's door. She opened the door, looked at him, and closed the door. He went back out to the front stairs. After another ten to fifteen minutes, she returned to where he was sitting and led him to the couch in her apartment. He performed oral sex on her, which led to sexual intercourse, and he ejaculated on her.

He then got dressed and she let him out the front door. He did not see or hear anyone in the apartment while he was there. After he left the apartment, he took a bus to his work at the Boston Medical Center. He clocked into work at 10:57 P.M. that night.

When the defendant left work at 7:30 A.M. on the morning of November 21, he stayed at the house of a friend on Clare Avenue in Roslindale, because he did not have a key to his fiancée's apartment. The friend was not at home. At 11:45 A.M., the defendant's cellular telephone activated a cellular tower located on Clare Avenue. While at his friend's house, he telephoned his father and spoke with him for ten minutes. He then left his friend's house and took a bus to his fiancée's apartment to help her with groceries. He carried the groceries and stayed in the apartment for ten to twenty minutes. He then returned to his friend's house in Roslindale and stayed there until 4 P.M., although the friend again was not there.

Discussion. 1. The Commonwealth's access to the defendant's CSLI. The defendant challenges the Commonwealth's obtaining the CSLI for his cellular telephone, arguing that under Commonwealth v. Augustine, 467 Mass. 230, 232 (2014) (Augustine I), the Commonwealth was required to seek such

information by a search warrant based on probable cause;[8] and that in any event, probable cause did not exist for the thirty-one days of CSLI that the Commonwealth sought and obtained.

a.  Relevant facts.  On December 8, 2011, the day the defendant was arrested and charged with the murder of the victim, an assistant district attorney applied to a Superior Court judge for an order under 18 U.S.C. § 2703(d) of the Stored Communications Act (§ 2703[d] order) to obtain from the defendant's cellular service provider CSLI records associated with the defendant's cellular telephone number for the period from November 1 to December 1, 2011.  An affidavit of a police detective supported the application.  The affidavit included information that the defendant had lived in the same housing complex as the victim and had lived across the hall from her until three weeks before her death, and that the defendant had recently provided the police with an oral swab for DNA testing which had indicated that the defendant's DNA was found on the body of the victim.  The affidavit further stated that the CSLI

---

[8] The defendant argues that what must be shown is that there is probable cause that the CSLI records "were relevant and material to an ongoing investigation."  That is not correct. The probable cause standard applicable to CSLI is "'probable cause to believe that a particularly described offense has been . . . committed' and that the CSLI sought will 'produce evidence of such offense or will aid in the apprehension of a person who the applicant has probable cause to believe has committed . . . such offense.'"  Commonwealth v. Augustine, 467 Mass. 230, 236 n.15 (2014) (Augustine I), quoting Commonwealth v. Connolly, 454 Mass. 808, 825 (2009).

would provide evidence relevant to the homicide, including the defendant's location at the time it had occurred. The judge allowed the Commonwealth's request, a § 2703(d) order issued, and the Commonwealth obtained the defendant's CSLI records for the requested thirty-one day period. A copy of the CSLI records for this entire period was admitted at trial as an exhibit but the prosecutor focused on the CSLI records for November 20 and November 21, 2011, in particular.

b. Analysis. In Augustine I, 467 Mass. at 231, 255, this court concluded that the government-compelled production of CSLI by a cellular telephone service provider is a search in the constitutional sense to which the warrant requirement of art. 14 of the Massachusetts Declaration of Rights applies. The defendant does not dispute that the Commonwealth's application for the § 2703(d) order met the standards of that statute, but challenges the absence of a search warrant and the existence of probable cause for the CSLI covering thirty-one days. See Commonwealth v. Estabrook, 472 Mass. 852, 858-859 (2015) (where Commonwealth has complied with 18 U.S.C. § 2703, it may obtain up to six hours of person's CSLI without search warrant).

We agree that if Augustine I were to apply here, the defendant's challenge to the admission of CSLI evidence for thirty-one days on the ground of lack of probable cause would likely succeed. But in Augustine, we concluded that the rule

requiring a search warrant based on probable cause to obtain CSLI for any substantial period of time was a new rule, and that, pursuant to the framework established in Teague v. Lane, 489 U.S. 288, 301 (1989), and Commonwealth v. Bray, 407 Mass. 296, 301 (1990), "this new rule applies only to cases in which a defendant's conviction is not final, that is, to cases pending on direct review in which the issue concerning the warrant requirement was raised." Augustine I, 467 Mass. at 257. The defendant contends that he fits within this limitation, because his case was pending on direct review at the time of the court's decision in Augustine I, and the warrant requirement issue is raised in this appeal. This contention fails. The import of the quoted language from our decision in Augustine I is that the search warrant requirement -- the new rule -- applies only to cases pending on direct appeal in which the warrant issue was raised before or during trial. This is the generally applicable principle of retroactivity that applies to new rules in criminal cases. See, e.g., Commonwealth v. Figueroa, 413 Mass. 193, 202 (1992), S.C., 422 Mass. 72 (1996) ("Retroactive application of a rule of criminal law is indicated if [1] a case is on direct appeal or as to which time for direct appeal has not expired when the new rule is announced, and [2] the issue was preserved at trial" [citation omitted]).[9] Here, although the case was on

---

[9] In his reply brief, the defendant asserts that the

direct appeal when Augustine I was decided, the defendant did not challenge either before or during his trial the Commonwealth's having obtained the defendant's CSLI pursuant only to a § 2703(d) order. Accordingly, the question we must answer is whether the unobjected-to admission of the CSLI

---

"clairvoyance exception" to the general rule of retroactivity should apply in his case. See, e.g., Commonwealth v. D'Agostino, 421 Mass. 281, 284 (1995), quoting Commonwealth v. Bowler, 407 Mass. 304, 307 (1990) ("[A] defendant does not waive a constitutional issue by failing to raise it before the theory on which his argument is premised has been sufficiently developed to put him on notice that that the issue is a live issue. Counsel need not be 'clairvoyant'"). The defendant's claim fails because by the time the defendant was arrested in 2011, the issue of search and seizure concerning tracking technology was widely known. See, e.g., Commonwealth v. Connolly, 454 Mass. 808, 811 (2009), in which this court concluded that under art. 14 of the Massachusetts Declaration of Rights, a warrant was required for police to place a global positioning system (GPS) tracking device on a vehicle. See also id. at 819-822 (analyzing State and Federal cases on constitutionality of tracking devices). CSLI presents the same legal search and seizure issue as GPS data, i.e., where the location data generated from both are due to tracking technology, such that it could have been raised by the defendant here in a motion to suppress. See Augustine I, 467 Mass. at 254 (GPS tracking data and CSLI implicate same constitutionally protected interest in reasonable expectation of privacy "by tracking a person's movements"). For example, according to the record in the Augustine case, counsel for Augustine raised the CSLI issue in a motion to suppress filed November, 2012, approximately one year before the defendant's trial in this case. See id. at 231-232. Moreover, as discussed in Augustine I, supra at 253, the court's decision included consideration of Federal cases, dating back to 2010 and 2011, that specifically discussed the constitutional issue that CSLI presented. Thus, we see no reason to alter our conclusion that the new rule requiring a warrant for CSLI be limited to those cases where a defendant's conviction is not final and where "the issue concerning the warrant . . . was raised." Id. at 257.

evidence that was obtained without a search warrant created a substantial likelihood of a miscarriage of justice.

Although thirty-one days of CSLI records were admitted as an exhibit at trial, the trial record makes clear that the only CSLI evidence actually referenced related to November 20 and 21, 2011. As the defendant recognizes in his brief, in light of the information known to the police concerning the presence of the defendant's DNA on the victim and that he lived in the same apartment complex, there was probable cause to believe that CSLI for these two days, which would assist in determining the defendant's location in the hours before, during, and following the victim's death, was reasonably related to the criminal investigation of the victim's death by homicide. See Commonwealth v. Augustine, 472 Mass. 448, 454-455 (2015). See also Commonwealth v. Kaupp, 453 Mass. 102, 110 (2009). In these circumstances, it cannot be said that the defendant was unfairly prejudiced by admission of the CSLI evidence. No substantial likelihood of a miscarriage of justice occurred.

2. Search of defendant's cellular telephone. The defendant challenges the search of the contents of his cellular telephone that was made by police officers in October, 2012, pursuant to a search warrant. He argues that the warrant was in effect a general warrant that authorized a search of vast amounts of information stored on the cellular telephone, and it

was issued without satisfying either the requirement of particularity or demonstrating probable cause for much or all of it.  He contends also that because the search conducted by the police did not commence within seven days of the issuance of the warrant, the search was invalid.

a.  Relevant facts.  At the time of the defendant's arrest on December 8, 2011, the police seized his cellular telephone and stored it at the police department.  Ten months later, the police applied for, and obtained, a search warrant to search its contents.  The affidavit of a police detective, filed in support of the warrant application, included the following information: after the victim's body was discovered in her apartment on November 21, 2011, the victim's cellular telephone was not found anywhere in the apartment, a fact that the victim's daughter could not account for; until three weeks before the victim's death, the defendant had been living in an apartment on the same hall as the victim's and recently had moved to another apartment in the same housing complex; the defendant had provided an oral swab for DNA testing voluntarily, and on December 8, the results of that testing indicated that the defendant was the source of DNA taken from the victim; the defendant was arrested on December 8 and gave a statement to the police in which he claimed to have had a consensual sexual encounter with the victim on the night before her death, and said that at the time

of her death he was with a friend at the friend's home on Claire Avenue; examination by the police of records for the defendant's cellular telephone suggested that the defendant was six miles away and not at the victim's apartment on the evening of November 20; and on November 21, the day of the victim's death, between 11:46 A.M. and 3:33 P.M., "there were no phone calls made or answered by the defendant, therefore, no cell site information could be obtained[, but] [d]uring this time frame . . . [the defendant's] phone records reveal that the defendant did use his phone to receive and send text messages, as well as access the [I]nternet."  The affidavit then stated that based on the detective's training and experience, he had "personal knowledge that cellular telephones contain multiple modes used to store vast amount of electronic data."  It next describes the many types of data the detective sought "to search for and, if found, extract from" the defendant's cellular telephone,[10] and

---

[10] The affidavit states:  "The electronic data that I [the affiant] seek to search for and, if found, extract from the above described phone, includes the following:  the subscriber's telephone number, electronic serial number (ESN), international mobile equipment identity (IMEI), mobile equipment identifier or other similar identification number; contact list, address book, calendar and date book entries, group list, speed dial list; and phone configuration information and settings.  I would also seek to extract all saved, incoming, outgoing[,] draft, sent, and deleted text messages; saved, opened and unopened voice mail messages; saved, opened and unopened electronic mail messages; mobile instant message chat logs, data, and contact information; {I}nternet browser history; and saved and deleted files including photograph and movie files."

continues as follows:  "Based on the information gathered through this investigation, it is my opinion that there is probable cause to believe that the cell phone and its associated accounts and accessories will likely contain information pertinent to this investigation.  The evidence should be found on, and within phone described above assigned to [the defendant's phone number]. . . .  Therefore I respectfully request that the court issue a search warrant for the said cell phone."

A Superior Court judge approved the issuance of a search warrant on October 11, 2012.  The warrant authorized a search of the defendant's cellular telephone and in particular the items that had been described in the affidavit (see note 10, supra), but the police did not conduct the search until thirteen days later.  The return was filed on October 26, 2014.

b.  Analysis.  We agree with the defendant that the search of his cellular telephone was not supported by probable cause, and that the search warrant was overly broad.  As a general matter, "probable cause requires a substantial basis . . . for concluding that the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues."  Commonwealth v. Dorelas, 473 Mass. 496, 501 (2016), quoting Commonwealth v. Kaupp, 453 Mass. at

But as we observed in <u>Dorelas</u>, which involved a search of a cellular telephone offering features and access to the Internet similar to the defendant's, where search of this type of cellular telephone is sought, there must be probable cause that the device contains "particularized evidence" relating to the crime.  See <u>Dorelas</u>, <u>supra</u> at 502.  The properties of such a telephone render it "distinct from the closed containers regularly seen in the physical world, [and] a search of its many files must be done with special care and satisfy a more narrow and demanding standard" than exists for establishing probable cause to search physical containers or other physical items or places.  See <u>Dorelas</u>, <u>supra</u> at 502.  In particular, it is not enough that the object of the search <u>may</u> be found in the place subject to search.  See <u>id</u>. at 501-502.  Rather, the affidavit must demonstrate that there is a reasonable expectation that the items sought <u>will</u> be located in the particular data file or other specifically identified electronic location that is to be searched.  See <u>id</u>. at 503-504.

In this case, the detective's affidavit sets out facts, based on the CSLI relating to the defendant's cellular telephone that the police had obtained previously, that call into serious question the veracity of the defendant's statement that he had a consensual sexual encounter with the victim on the night before

her death.[11] But as the affidavit itself makes clear, the police already had not only the defendant's CSLI but his phone records (presumably call logs), and thus they would have known that the victim's cellular telephone number did not appear anywhere in those records. The affidavit points to no "particularized evidence" suggesting that the contents of the defendant's cellular telephone and specifically the files that police sought to seize or search, including the contact list, address book, voice mail, text, and electronic mail (e-mail) messages (see note 10, supra), were likely to contain information linking the defendant to the victim or relating to the victim's killing. Here, the affidavit fails to provide a substantial, particularized basis reasonably to expect that the files on the cellular telephone that police sought to search would contain information related to the homicide under investigation. All

---

[11] The affidavit also states that on the date the victim was killed, "between 11:46 A.M. and 3:33 P.M., there were no phone calls made or answered by the defendant, [and] therefore, no cell site information could be obtained. During this time frame, however, his phone records reveal that the defendant did use his phone to receive and send text messages, as well as access the [I]nternet" (emphasis added). The trial record indicates that this last statement was factually inaccurate: the cellular service provider representative testified that the telephone records contained no evidence of any text message, Internet, or any other activity on the defendant's cellular telephone during the cited time frame. Accordingly, we disregard this statement in considering whether the affidavit established the requisite probable cause.

the affidavit states is that the affiant knows from training and experience that "cellular telephones contain multiple modes used to store vast amounts of electronic data[,]" and that in his opinion, "there is probable cause to believe that the [defendant's] cell phone and its associated accounts . . . will likely contain information pertinent to this investigation." This general, conclusory statement adds nothing to the probable cause calculus.[12] See Dorelas, 473 Mass. at 503-504.[13]

In sum, the affidavit did not provide probable cause to search the contents of the defendant's cellular telephone. The defendant's motion to suppress the fruits of the search of his

---

[12] We note that the police did not seek a warrant to search the contents of the defendant's cellular telephone for almost ten months. They apparently obtained the defendant's cellular telephone at the time of his arrest, although the reason for their having done so is not clear; it may have been as part of essentially an inventory search at the time the defendant was brought to the police station and placed in custody. In any event, the defendant does not raise any issue concerning the delay in seeking a search warrant, and we have concluded that the defendant's motion to suppress evidence of the contents of the cellular telephone should have been granted for other reasons.

[13] The overbroad nature of the warrant also is problematic. In Commonwealth v. Dorelas, 473 Mass. 496, 499 (2016), the warrant authorized a search of the defendant's cellular telephone that was virtually identical to the search authorized here. We concluded in that case that the warrant was "awkwardly written, conflating at least in part the items to be searched for and the places to be searched[,]" and that "as written the warrant and the warrant application are overly broad." See id. at 499 n.3. See also id. at 506-507 (Lenk, J., dissenting). The same holds true here.

cellular telephone should have been allowed.[14]  Therefore, the question is whether the erroneous denial of the defendant's motion to suppress -- an error that violated the defendant's rights under the Fourth Amendment to the United States Constitution and art. 14 -- was harmless beyond a reasonable doubt.  See Commonwealth v. Thomas, 469 Mass. 531, 552a (2014).

Considering the totality of the trial record, we are satisfied that the error was harmless beyond a reasonable doubt. The cellular telephone search yielded a number of text messages, three of which were used at trial, but none was admitted in evidence.  Two of the text messages -- an exchange between the defendant and his fiancée at 12:41 P.M. on November 21, 2011 -- were used by the prosecutor solely to refresh the respective memories of the fiancée and the defendant when each testified at trial.  As the Commonwealth argues, a witness's memory may be refreshed with anything.  See Commonwealth v. O'Brien, 419 Mass. 470, 478 (1995); Mass. G. Evid. § 612(a)(1) (2016).  The fact that the item itself may not be admissible in evidence is not

---

[14] Given this conclusion, it is not necessary to resolve whether, as the defendant claims, the search was invalid because it was not commenced within seven days of the date of the warrant.  See Commonwealth v. Cromer, 365 Mass. 519, 525 (1974). We note, however, that there is much force to the conclusion reached by the Superior Court judge who ruled on the defendant's motion to suppress, that with respect to searches of computer files and the contents of a cellular telephone that is a "smart phone" with computer capacity, the reasoning and holding of Cromer may not apply.

necessarily a bar to its use for this purpose. See Commonwealth v. Woodbine, 461 Mass. 720, 731-732 (2012). The substance of each of these text messages was not read to the jury, and the defendant did not object at trial to the use of the messages for refreshing memory. In the circumstances of this case, given the limited nature of the use of these two text messages, we conclude that there was no error.

The third text message obtained from the defendant's cellular telephone and used at trial was a message sent by the defendant to his fiancée on November 24, 2011, three days after the homicide. The background of its use at trial is the following. A theme of the Commonwealth's case against the defendant at trial was that in November, 2011, the defendant was sexually frustrated because his fiancée was close to nine months pregnant and could not have sex with him, and therefore he was searching for other available sexual partners. During her cross-examination of the defendant, the prosecutor asked him if he was angry or frustrated because his fiancée could not have sex with him; the defendant answered, "No." Over objection, the prosecutor was then permitted to read out loud his November 24, 2011, text message,[15] and neither the defense counsel nor the

---

[15] The text message read: "I wouldn't have to talk dirty to people or ask for picks and chat about getting head if you took care of me. I wouldn't have time. People look for what they don't have or get."

prosecutor asked for, and the judge did not give, a limiting instruction restricting the jury's use of this particular evidence for impeachment purposes only.[16] Near the outset of her closing argument, the prosecutor referred to this text message in discussing the defendant's motive.[17]

In determining whether the use of this text message at trial was harmless beyond a reasonable doubt, "we consider 'the importance of the evidence in the prosecution's case; the relationship between the evidence and the premise of the defense; who introduced the issue at trial; the frequency of the reference; whether the erroneously admitted evidence was merely cumulative of properly admitted evidence; the availability or effect of curative instructions; and the weight or quantum of evidence of guilt.'" Thomas, 469 Mass. at 552a, quoting

---

[16] In his final instructions, the judge gave in effect a partial limiting instruction. He explained to the jury that evidence suggesting that the defendant and his fiancée might have had a strained relationship and that his fiancée was accusing him of infidelity was to be considered only in assessing the credibility of the witnesses and in providing evidence of motive.

[17] The prosecutor argued:

"So why did he do it, ladies and gentlemen. Why? You saw the text message that he sent to his nine-month pregnant fiancée on November 24th. She wasn't taking care of him. She wasn't taking care of him, his nine-month pregnant fiancée. She wasn't taking care of him. And so he felt entitled to go out and get what he wanted, to satisfy himself. As he said, people look for what they're not getting. Well, he looked for it, and where did he look for it?"

Commonwealth v. Santos, 463 Mass. 273, 287 (2012). Certainly, evidence of motive on the defendant's part was important to the Commonwealth's case, this evidence bore on motive, and the evidence was introduced by the prosecution, over the defendant's objection. However, the prosecutor's use of the statement was limited to reading it to impeach the defendant's credibility during his testimony and referencing it one time near the beginning of a lengthy closing argument that focused primarily on the strong evidence of the defendant's guilt provided by the DNA evidence.

But of greater significance is the fact that the other evidence of the defendant's guilt was extremely strong. The DNA evidence linking the defendant, and only the defendant, to the victim in an act of sexual penetration was essentially overwhelming, and indeed not questioned by the defendant. His explanation at trial for the presence of his semen in and on the victim's body and clothes was that on the night before the victim was killed, he and the victim had had a consensual sexual encounter, and, presumably, someone else had entered the victim's apartment during the day on November 21 and had killed her. But the testimony of the victim's sixteen year old daughter that the family was alone on the night of November 20, and the evidence of the defendant's CSLI, which placed him six miles away from the victim's apartment and very near his place

of employment close to the time he said the consensual encounter with the victim had occurred, offered a powerful refutation of the defendant's claim that he had had a consensual sexual encounter with the victim.  Moreover, there was significant, properly admitted, evidence other than this text message, including testimony supplied directly by the defendant, that his relationship with his fiancée was strained in November, 2011, and that he was open to and engaging in sexual intercourse with others, including the victim.  Finally, the position and condition of the victim's body when she was found splayed on the floor of her apartment, the location of her clothes pulled up on her and underneath her, and the socks and UBS cord around her neck strongly supported a conclusion that the victim had been raped and strangled as part of a single, violent assault.  In sum, on this trial record, we are confident that the November 24, 2011, text message could not have reasonably affected the jury's determination that the defendant was guilty of raping and murdering the victim.  The error in permitting the prosecutor to use this text message was harmless beyond a reasonable doubt.

3.  <u>Juror's note</u>.  The defendant claims that the judge erred in his response to a note written by a juror during trial when the judge declined to show the note to the defendant or counsel for the parties before instructing the jury, and thereby deprived the defendant of the opportunity to participate in

shaping an appropriate response.  He argues that the error was of constitutional significance and not harmless beyond a reasonable doubt, and therefore requires reversal of his convictions.

a.  Relevant facts.  After the lunch break on the seventh day of trial, the judge notified counsel at sidebar that a juror had sent a note, but told them that he was not going to discuss the note or share it with counsel at that time.  None of the attorneys objected.  At the end of the day, the judge revisited the topic of the juror's note.  He read counsel the first two sentences and the last sentence of the note,[18] but again stated that he would not permit counsel to examine the note itself, saying that it would be placed under seal.  The judge stated that the note concerned a portion of the evidence and litigation strategy, that nothing in the note suggested the juror could not be indifferent, and that he was concerned that one or both sides would try to tailor their litigation strategy to the note-writing juror's thought process, which the parties, counsel, and

---

[18] The text of the note was as follows:

"I apologize for my ignorance. I believe it's my civic duty to say that the defense is focusing on cross-examining the wrong evidence.  We've established that the fingernail and sock DNA results are inconclusive.  I believe the defense should try and cross-examine the anorectal sperm DNA results.  This is more fair for the defense.  Writing this has not made me partial in any way, and I remain indifferent."

the judge were not entitled to know. The judge also gave counsel a preview of the instruction he intended to give the jury about the note. The defendant's counsel objected, arguing that the defendant was entitled to see the note. The judge overruled the objection and gave the entire jury an instruction to the effect that it was not their civic duty to seek out evidence or decide whether the case is being properly presented by the parties, but rather their duty was to assess the evidence, find the facts, and apply the law to decide whether the Commonwealth proved its case beyond a reasonable doubt.[19]

---

[19] The judge instructed as follows:

"Now one other matter to address is a communication that I've received through the court officers from one . . . of our jurors commenting on some of the evidence that has been heard, and on the way in which the attorneys are presenting this evidence, and the juror reference that they felt it was a civic duty to make these comments, notwithstanding that it would not in any way affect the juror's ability to be impartial, and that the juror remains indifferent. And I've discussed generally that I received a note, but not the content of the note with counsel, because the content of the note in some way reflects an individual juror's thoughts about the evidence, and it is no one's business as to what any of you may be thinking but for you. But I do not want to just let the sending juror know I have received this note, and to clarify that it is not the civic duty of any of you to seek out the evidence, or decide whether or not this case is being properly presented by one or the other or both sides in this case. Your sole duty in this case as a juror is to impartially listen to the evidence presented, and at the end of this case then to impartially and fairly assess that evidence as part of the deliberating jury, to determine the facts from that evidence, and then to apply the law to that evidence, and through that process determine whether or not the

The defendant objected and filed a petition for relief in the county court pursuant to G. L. c. 211, § 3. The trial was stayed briefly by a single justice, and then lifted after the judge read the juror's note to counsel and the defendant. The next trial day, the defendant moved for a mistrial on the ground that the defendant had not been given an opportunity to be heard and to participate in shaping the contents of the response to the note before the judge addressed the jury; he argued in particular that he would have requested that the judge not respond substantively to the juror's note at all, but simply acknowledge receipt. The judge denied the motion for a mistrial. Ultimately, the juror who had written the note was chosen as an alternate juror and did not deliberate.

b. Analysis. When a jury pose a question to the judge that is of legal significance, the question from the jury generally is to be shown to counsel and the parties, who are entitled to participate in developing a response, and to voice their objections to the judge's proposed response. See, e.g., Commonwealth v. Floyd P., 415 Mass. 826, 833-834 (1993). See also Thames v. Commonwealth, 365 Mass. 477, 478 n.2 (1974) ("where possible, any messages or questions from the jury to the

Commonwealth has proved its case beyond a reasonable doubt. It is not your duty to suggest how a case ought to be tried or what evidence ought or ought not to be presented. So I want you to be aware that I do have the note, I have reviewed it, and that is my response to the note."

judge . . . should be shown to counsel and immediately placed on record").  The rule finds its roots in the defendant's rights guaranteed by the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights to effective assistance of counsel and to be present at all critical stages of the trial.  See Commonwealth v. Bacigalupo, 49 Mass. App. Ct. 629, 631-634 (2000), and cases cited.  See also Shields v. United States, 273 U.S. 583, 588-589 (1927); United States v. Parent, 954 F.2d 23, 24-25 (1st Cir. 1992).

In each of the cases cited supra, however, the question or communication from the jury at issue was delivered to the judge on behalf of the jury as a whole while they were deliberating on their verdict.  In this case, the note in question was from a single juror, and was written and delivered to the judge while the trial was still ongoing.  This difference is significant.  Nevertheless, although we understand the judge's concern that the substance of the question, if shown to counsel, would open a window into the individual thought process of the juror while the trial was still ongoing, it was error for the judge not to have allowed counsel to read the juror's note at or near the time it was delivered and to participate meaningfully in shaping

the judge's response to it.[20]  See Floyd P., 415 Mass. at 833-834, and cases cited.

We conclude, however, that the judge's erroneous treatment of and response to the juror's note does not warrant reversal of the defendant's convictions.  This is not a case where a deliberating jury asked a question seeking further guidance from the judge on a legal issue that presumably bore directly on their collective resolution of the case.  Rather, the note reflected a single juror's observations about the trial strategy being followed by defense counsel in relation to one type of evidence as the trial was proceeding.  Furthermore, although the judge did not share the entire contents of the juror's note with counsel before responding to it with an instruction, he summarized the substance of it.  Contrast, e.g., Parent, 954 F.2d at 24-25 (in response to jury's question, judge unilaterally gave jury written pages of proposed instructions government had earlier submitted without first informing counsel of jury question or proposed response).  Contrast also Shields, 273 U.S. at 585 (communications between jury and judge occurred during deliberations; defense counsel never informed); Fillippon v. Albion Vein Slate Co., 250 U.S. 76, 80 (1919) (in civil case,

_____

[20] We disagree with the Commonwealth that the judge's reading of the note's first phrase and final sentence, and giving counsel a preview of what he intended to say, was an adequate substitute.

judge responded to jury's written inquiry during deliberations by instructing jury without informing counsel). Finally, although the defendant lost the "opportunity to convince the judge that some other or different response would be more appropriate," Parent, 954 F.2d at 26, the instruction provided by the judge accurately reflected governing principles concerning the proper role and function of the jury, and did not prejudice the defendant in any respect.[21] In the circumstances, although we question whether the harmless beyond a reasonable doubt standard applies here, the judge's error met this standard. Cf. Commonwealth v. Curtis, 417 Mass. 619, 636 (1994) (constitutional violation was harmless beyond reasonable doubt where instruction was more favorable to defendant than he was entitled to). Contrast Commonwealth v. Davis, 52 Mass. App. Ct. 75, 77-78 (2001) (reversible error where trial judge provided misleading and inadequate answer to jury question without consulting counsel).

4. Review under G. L. c. 278, § 33E. Based on a careful and thorough review of the record in this case in accordance with our obligation under G. L. c. 278, § 33E, we conclude that

---

[21] Defense counsel at trial argued that the defendant was prejudiced by the judge's instruction because it constituted a "rebuff" to the juror who had written the note. The characterization seems overblown, but even if it were not, the note-writing juror was chosen as an alternate at the end of the trial and did not participate in the jury verdict.

there is no basis to grant the defendant a new trial or other relief.

Conclusion.  The judgments of conviction are affirmed.

So ordered.