NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

16-P-1251                                          Appeals Court


COMMONWEALTH  vs.  MICHAEL AARON JORDAN.[1]


No. 16-P-1251.

Suffolk.     May 9, 2017. - July 6, 2017.

Present:  Agnes, Massing, & Lemire, JJ.


Cellular Telephone.  Practice, Criminal, Motion to suppress, Warrant, Affidavit.  Constitutional Law, Search and seizure, Probable cause.  Search and Seizure, Warrant, Affidavit, Probable cause.  Probable Cause.


Indictments found and returned in the Superior Court Department on February 20, 2015.

A pretrial motion to suppress evidence was heard by Kenneth W. Salinger, J.

An application for leave to prosecute an interlocutory appeal was allowed by Robert J. Cordy, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.


Cailin M. Campbell, Assistant District Attorney, for the Commonwealth.
Lefteris K. Travayiakis for the defendant.

---

[1] We use the name that appears on the Superior Court docket, as a copy of the indictment is not in the record appendix.

MASSING, J.  Ahmir Lee was shot to death on Boylston Street, near Copley Square in Boston, on the night of August 22, 2013.  The investigation of the murder focused on the defendant, Michael Aaron Jordan.  On December 30, 2013, the police obtained a search warrant directing the defendant's cellular telephone service provider, Metro PCS (provider), to produce "records regarding cell site tower locations, call details, incoming/outgoing text messages, subscriber information, cell sites and GPS records" associated with the defendant's telephone number for the six-week period surrounding the date of the homicide.

About one year later, a grand jury issued an indictment charging the defendant with murder, G. L. c. 265, § 1, and carrying a firearm without a license, G. L. c. 269, § 10(a).  Acting on the defendant's motion to suppress, a Superior Court judge entered an order suppressing all cell site location information (CSLI),[2] text messages, and contact information obtained from the provider.  The judge reasoned that the affidavit in support of the search warrant failed to establish probable cause that the defendant committed the murder or that any information from the defendant's cellular telephone would provide evidence of the murder.  The judge denied the motion

_____

[2] For a concise definition of CSLI, see Commonwealth v. Estabrook, 472 Mass. 852, 853 n.2 (2015).

insofar as it sought the suppression of "subscriber information" and "call details," noting that such information does not implicate constitutionally protected privacy interests.  The Commonwealth obtained leave to pursue an interlocutory appeal from the suppression order.  See Mass.R.Crim.P. 15(a)(2), as appearing in 422 Mass. 1501 (1996).  We affirm in part and reverse in part.

Background.  Our review of whether an affidavit in support of a search warrant established probable cause is restricted to the "four corners" of the affidavit.  Commonwealth v. O'Day, 440 Mass. 296, 297 (2003); Commonwealth v. Perez, 90 Mass. App. Ct. 548, 551 (2016).  Accordingly, we recite the facts set forth in the affidavit of Boston police Detective Melvin Ruiz.

Boston police officers were called to 553 Boylston Street at 11:09 P.M. on August 22, 2013.  The victim was lying on his back, unresponsive and bleeding from the chest.  He was pronounced dead minutes later at the Boston Medical Center.  A medical examiner determined that the victim died of a gunshot wound.

A number of witnesses were interviewed at Boston police headquarters.  Two employees of a nearby restaurant heard three gunshots as they were leaving work.  One employee, who was walking toward Boylston Street, saw a man "walking really fast" toward a car parked at the intersection of Clarendon and

Boylston Streets. She described him as "short, [five feet, seven inches or five feet, eight inches tall], stocky build, shaved head, light skin black male, baggy baby blue shirt with designs and oversized jean shorts." This witness saw the man get into an "older car, gray in color, leather top, boxy style" and then drive down Clarendon Street "really fast" toward "Saint James Street." Her coworker, the second witness, was crossing the street toward Trinity Church when he saw a person holding a grey or silver gun walking toward him. The witness turned the other direction and was unable to describe the person; however, he then saw an older model car (1989-1992), possibly a Cadillac Eldorado, with a "leather or ragtop roof, cream/beige in color," driving "really fast" on Clarendon Street.

A third witness, who had parked his car in front of a fast food restaurant on Boylston Street, heard an argument, then three or four gunshots. He saw the victim run across the street and fall to the ground and another man walk away in the direction of the church. This witness described the man as "a white Hispanic male, [mid-thirties], . . . [five feet, one inch or five feet, two inches tall], 200 [pounds], heavy build, wearing a blue baggy shirt and jean shorts down to the knees."

Two other witnesses, a father and his son, were hanging banners on Boylston Street at the time of the incident. The son observed three men talking on the benches in the park across the

street.  He heard a shout and then three or four gunshots; he also saw a man holding something in his right hand and saw flashes coming from the object.  The son described the man as a "short fat guy, black Hispanic male, skin complexion of the baseball player A-Rod (Alex Rodriguez) from the New York Yankees, between [five feet, six inches to five feet, seven inches tall], heavy build, 250 [pounds], in his [mid-twenties or mid-thirties], wiffle short haircut, wearing a light blue tee shirt, and baggy dark blue shorts."[3]  The father heard "pops" and saw the victim being chased across the street.  He also saw a man on the sidewalk, whose right arm was raised, run toward Clarendon Street.  The father described the suspect as a "black male, short, [four feet, nine inches tall], stocky build, medium build, wearing . . . a bright blue, baseball short sleeve shirt."

The sixth witness was a man who knew the victim as "Dough Boy."  On the night of the shooting, this witness saw the victim at the benches near Clarendon and Boylston Streets, then heard three gunshots.  The witness said that the victim ran toward him, then crossed Boylston Street and fell to the ground.  This witness saw a man shooting in his direction, whom he described

---

[3] The son described the third man, who was unarmed and ran toward Dartmouth Street, as a "black Hispanic male," six feet tall, "skinny, about 180 [pounds]."

as "short, light skin, Spanish . . . between [five feet, seven inches, and five feet, eight inches tall]."

Based on a tip,[4] the investigation focused on the defendant, who was twenty-six years old, five feet, four inches tall, and weighed 200 pounds. The defendant was the registered owner of a brown, 1991 Chrysler New Yorker. Surveillance video recordings, made near the defendant's residence on Blue Hill Avenue in the Roxbury section of Boston four hours before the murder, showed a man "wearing a long blue shirt with light colors on the back of the shoulder and dark pants, who matched the physical description of the suspect" coming from the direction of the defendant's address and getting into a "tan/beige boxy type motor vehicle" parked across the street. The car appeared to be a Chrysler New Yorker with a vinyl or leather half-top. Other surveillance recordings show the same car parked across the street from the defendant's address on a regular basis during the ten-day period before the murder. After the murder, the car

_____

[4] The tip, from "a person known to the Commonwealth," was that someone "known to them as 'Michael'" shot the victim over "drug dealing in the park." "For statements of confidential informants to be used in the assessment of probable cause under art. 14 [of the Massachusetts Declaration of Rights], the Commonwealth must satisfy the Aguilar-Spinelli test." Commonwealth v. Tapia, 463 Mass. 721, 729 (2012), citing Aguilar v. Texas, 378 U.S. 108 (1964), and Spinelli v. United States, 393 U.S. 410 (1969). As the affidavit provided absolutely no information about the informant's basis of knowledge or veracity, it did not satisfy this test. See Tapia, supra. The motion judge gave no weight to this anonymous, uncorroborated tip, and neither do we.

was no longer seen in the area; its registration was revoked about one and one-half months after the murder. Ruiz's affidavit also stated, "while monitoring the same surveillance footage, I observed the individual, believed to be [the defendant] holding an object, believed to be a cellular phone to his ear as he walked toward the vehicle."

The police ascertained the defendant's cellular telephone number and provider. Using an administrative subpoena, they learned that the defendant had activated his cellular telephone number in 2009 and had terminated service on September 12, 2013, three weeks after the murder. The records showed that "in and around the time of the murder on August 22, 2013, there were many inbound and outbound cellular phone calls made from this number," including telephone calls with two members of the defendant's family.

Based on these facts, Ruiz stated, "I believe that by receiving the Metro PCS cell site towers information, I can confirm that [the defendant] was in fact on Boylston Street during and after the homicide of the victim." The affidavit concluded with a request not just for CSLI ("cell site tower locations" and "cell sites and GPS records"), but also for "call details, incoming/outgoing text messages, [and] subscriber information" associated with the defendant's cellular telephone for the period from August 1, 2013, through September 12, 2013,

that is, from three weeks prior to the murder to three weeks after the murder, also coinciding with the termination of the defendant's cellular telephone service.

Discussion. 1. Search warrant requirements in the context of cellular telephones. In Commonwealth v. Augustine, 467 Mass. 230 (2014) (Augustine I), S.C., 470 Mass. 837 (2015), and 472 Mass. 448 (2015), the Supreme Judicial Court "concluded that the government-compelled production of CSLI by a cellular telephone service provider is a search in the constitutional sense to which the warrant requirement of art. 14 of the Massachusetts Declaration of Rights applies." Commonwealth v. Broom, 474 Mass. 486, 491-492 (2016).[5] In Commonwealth v. Fulgiam, 477 Mass. 20, 32-33 (2017), decided just days before oral argument in this appeal, the Supreme Judicial Court held that a search warrant also is required to obtain text messages from a cellular telephone, even when those messages are held by a third-party cellular telephone service provider.[6]

---

[5] Here, because the Commonwealth sought the CSLI for a six-week period, a search warrant was required. See Commonwealth v. Estabrook, 472 Mass. 852, 858-859 (2015) (assuming compliance with 18 U.S.C. § 2703 (2006), request for historical CSLI for period of six hours or less does not require search warrant, whereas request for two weeks of CSLI requires warrant).

[6] The motion judge correctly anticipated the result in Fulgiam, stating, "It should not make any constitutional difference whether police seek to access text messages . . . through an individual's cell phone . . . or to obtain the exact

"Under the Fourth Amendment and art. 14, a search warrant may issue only on a showing of probable cause." Commonwealth v. Anthony, 451 Mass. 59, 68 (2008). To obtain a search warrant for text messages or CSLI, the affidavit must demonstrate "probable cause to believe 'that a particularly described offense has been, is being, or is about to be committed, and that the [text messages or CSLI] will produce evidence of such offense or will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit such offense.'" Augustine I, supra at 256, quoting from Commonwealth v. Connolly, 454 Mass. 808, 825 (2009). See Fulgiam, supra at 32.

"In dealing with probable cause . . . we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Commonwealth v. Hason, 387 Mass. 169, 174 (1982), quoting from Brinegar v. United States, 338 U.S. 160, 175 (1949). See generally Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 8-1 (2017). "[A]ffidavits in support of search warrants are to be approached with a view toward common sense, read in their entirety and with considerable latitude

---

same information from storage devices maintained by or for the cellular service provider."

allowed for the drawing of inferences."  Commonwealth v. Santiago, 452 Mass. 573, 576 (2008), quoting from Commonwealth v. Jimenez, 438 Mass. 213, 218 (2002).  See Commonwealth v. Donahue, 430 Mass. 710, 712 (2000), quoting from Commonwealth v. Blake, 413 Mass. 823, 827 (1992) (search warrant affidavits should be "read as a whole, not parsed, severed, and subjected to hypercritical analysis").

"Because a determination of probable cause is a conclusion of law, we review a search warrant affidavit de novo." Commonwealth v. Foster, 471 Mass. 236, 242 (2015).  With the above principles in mind, we consider whether the affidavit established probable cause that a crime was committed and that the text messages, CSLI, and contact information from the defendant's cellular telephone would provide evidence connected to the crime.

2.  Whether the affidavit established probable cause.

A.  Probable cause that a crime was committed.  The affidavit established probable cause to believe that Ahmir Lee had been murdered.  The affidavit provided multiple witness accounts of the shooting and stated the medical examiner determined that the victim died from a gunshot wound.  Thus, the affidavit satisfied the first requirement for the search warrant.  See Fulgiam, 447 Mass. at 32, quoting from Augustine I, 467 Mass. at 256 (indicating first requirement for search warrant is satisfied

when affidavit demonstrates probable cause that "offense has been, is being, or is about to be committed").

B. <u>Probable cause that text messages would provide evidence connected to the crime</u>. To justify the seizure of text messages, in addition to establishing probable cause that a particular offense had been committed, the affidavit had to establish probable cause to believe that the content of the text messages would be relevant to the investigation of that offense. See <u>Fulgiam</u>, <u>supra</u>, quoting from <u>Augustine I</u>, <u>supra</u> (indicating second requirement for search warrant is satisfied when affidavit establishes probable cause "that [the text message content being sought] will produce evidence of such offense or will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit such offense").

"Before police may search or seize any item as evidence, they must have 'a substantial basis for concluding that' the item searched or seized contains 'evidence connected to the crime' under investigation (citation omitted)." <u>Commonwealth</u> v. <u>White</u>, 475 Mass. 583, 588 (2016), quoting from <u>Commonwealth</u> v. <u>Escalera</u>, 462 Mass. 636, 642 (2012). In other words, the affidavit must provide a substantial basis for the belief that there is a "(1) timely nexus between (2) criminal activity, (3) a particular person or place to be searched, and (4) a

particular item to be seized from that place or person."  Grasso
& McEvoy, Suppression Matters Under Massachusetts Law § 8-2, at
8-6.  See Commonwealth v. Banville, 457 Mass. 530, 538 (2010);
White, supra; Perez, 90 Mass. App. Ct. at 554.[7]

For example, in Commonwealth v. Dorelas, 473 Mass. 496, 503
(2016), the search warrant affidavit recited that the defendant
"had been receiving threatening communications on his [cellular
telephone] with respect to money he owed to 'people,' and indeed
had been using his [cellular telephone] while arguing with an
individual immediately prior to the shooting."  This information
provided a nexus between the shooting and information on the
defendant's cellular telephone, establishing probable cause that
it likely contained "evidence of communications both received as

---

[7] To the extent the Commonwealth argues that the standards
for warrants to obtain text messages were not yet established
when the Boston police prepared the search warrant application
in this case, we note that the nexus requirement was well
established long before the Supreme Judicial Court applied it to
cellular telephone content in White and Fulgiam.  See, e.g.,
Commonwealth v. Cinelli, 389 Mass. 197, 213, cert. denied, 464
U.S. 860 (1983) ("Information establishing that a person is
guilty of a crime does not necessarily constitute probable cause
to search the person's residence"; affidavit must demonstrate a
nexus between the residence and items related to criminal
activity expected to be found there); Commonwealth v. Wade, 64
Mass. App. Ct. 648, 651 (2005) ("The information in the
affidavit must be adequate to establish a timely nexus between
the defendant and the location to be searched and to permit the
determination that the particular items of criminal activity
sought reasonably could be expected to be found there").
Application of the exclusionary rule is appropriate under these
circumstances.

well as initiated and sent by the defendant that would link him and others to [the] shooting." Ibid.

To establish that information from a cellular telephone, including text messages, is likely to produce evidence of crime, it is not enough to rely on the ubiquitous presence of cellular telephones and text messaging in daily life, or generalities that friends or coventurers often use cellular telephones to communicate. See White, supra at 590; Fulgiam, 477 Mass. at 34-35. Nor may we rely on our conclusion, infra, part 2(C), that the affidavit established probable cause to believe that the defendant committed the crime. The Supreme Judicial Court has rejected the proposition "that there exists a nexus between a suspect's criminal acts and his or her cellular telephone whenever there is probable cause that the suspect was involved in an offense, [even when] accompanied by an officer's averment that, given the type of crime under investigation, the device likely would contain evidence." White, supra at 591.

Here the affidavit established, at most, that the defendant was using his cellular telephone four hours before the murder and used it to telephone two family members around the time of the murder. Other than the tip that someone with the defendant's first name shot the victim over drug dealing in the park (which we do not consider, see note 4, supra), the affidavit contained no information about the motive for the

crime, that the defendant was involved in drug dealing, or that he used his cellular telephone in the commission of the crime or in dealing drugs.  Even though the police possessed the defendant's contemporaneous cellular telephone call records, the affidavit contained no information linking the defendant with the victim, directly or indirectly.  Compare Broom, 474 Mass. at 496 (where police possessed defendant's call logs, and victim's cellular telephone number did not appear, affidavit failed to establish that contents of defendant's cellular telephone, including contact list, voice mail, texts, and electronic mail messages, would likely contain information linking defendant to victim or relating to her killing).

Because the affidavit made no connection between the defendant's use of his cellular telephone and his involvement in the crime, it did not establish probable cause for concluding that the text messages would provide evidence connected to the crime.  Thus, the judge correctly suppressed the text messages obtained through the warrant.

C.  Probable cause that CSLI would provide evidence connected to the crime.  To justify seizure of the defendant's CSLI, in addition to establishing probable cause that a crime was committed, the affidavit had to establish probable cause to believe that the CSLI would be relevant to the investigation of the crime.  See Commonwealth v. Augustine, 472 Mass. 448, 453-

454 (2015) (Augustine II).  Accordingly, the affidavit had to

provide a substantial basis for the belief there is a nexus

between the crime, the cellular telephone, and the CSLI.  See

White, 475 Mass. at 588-589.  The Commonwealth sought to use the

CSLI primarily to establish that the defendant was present in

the vicinity of Boylston Street near Clarendon Street at the

time of the murder, which would be probative evidence

implicating him in the murder.  See Augustine II, supra at 455-

456.

Because CSLI provides information solely about the

whereabouts of the cellular telephone user at different times,

the Commonwealth may obtain a search warrant for CSLI by

establishing probable cause that the suspect committed a crime,

that the suspect's location would be helpful in solving or

proving that crime, and that the suspect possessed a cellular

telephone at the relevant times.[8]  We conclude that the affidavit

satisfied each of these requirements.

The affidavit established probable cause to believe that

the defendant shot the victim.  Several witnesses saw a man

---

[8] We observe that the focus of the nexus requirement applies differently in the context of CSLI, which provides evidence of the cellular telephone user's whereabouts, than in the context of cellular telephone content such as text messages, voice messages, contact lists, or photographs, which implicates additional privacy concerns.  Contrast Augustine II, supra at 455-456 & n.11, with White, supra at 591.

wearing a baggy, blue shirt with oversized, dark shorts firing a gun, running from the scene of the crime down Boylston Street toward Clarendon Street, getting into a car parked there, and speeding away. Although the witnesses' descriptions of the man varied slightly, the composite description was of a short, stocky person of color with very short hair -- a description that matched the defendant.[9] Two witnesses described a car with distinctive features -- a boxy, older model sedan with a soft top -- that matched the defendant's car. A video recording near the defendant's residence four hours before the shooting showed a man matching the suspect's description getting into a car, which was parked across the street from the defendant's residence, that matched the description of both the defendant's and the suspect's car. In addition, the medical examiner determined that the victim died from a gunshot wound. When considered together, the information in the affidavit established a substantial basis to conclude that the defendant committed the crime.

The sufficiency of an affidavit "is to be decided 'on the basis of a consideration of all of its allegations as a whole, and not by first dissecting it and then subjecting each

---

[9] The affidavit does not describe the defendant's haircut or skin color, but it does state that the man near the defendant's residence in the video recording "matched the physical description of the suspect."

resulting fragment to a hypertechnical test of its sufficiency standing alone.'" Santiago, 452 Mass. at 576, quoting from Commonwealth v. Burt, 393 Mass. 703, 715 (1985). We disagree with the motion judge's determination that the elements of the affidavit were too general and, when considered together, did not create a substantial basis to conclude that the defendant committed the murder. The judge took three elements of the affidavit -- the description of the defendant, his presence in the vicinity of the crime, and the description of the car -- and found them wanting individually and when considered together. For example, the judge found that the affidavit provided too general a description of the suspect and failed to establish "whether scores, hundreds, or many thousands of vehicles still on the road [within] a reasonable drive of the murder scene would match the general description provided by the witnesses." To be sure, a search warrant could not issue based solely on the description of a short, stocky man of color, cf. Commonwealth v. Scott, 440 Mass. 642, 648 (2004) ("general description of a tall, muscular, black male" and his location insufficient to establish reasonable suspicion for investigative stop), or solely on the use of a boxy, older model car with a soft top, cf. Commonwealth v. Cheek, 413 Mass. 492, 496 (1992) (description of a "black male with a black [three-quarter] length goose" jacket walking near crime insufficient to

establish reasonable suspicion for investigative stop). "A description equally applicable to a large number of people, without more, may not support a finding of probable cause." Commonwealth v. Carrington, 20 Mass. App. Ct. 525, 528 (1985). But the affidavit here did not rely solely on general descriptions. While each of the elements of the affidavit, standing alone, may not have been sufficient, when considered together, they created a substantial basis to conclude that the defendant committed the murder.

With due deference to the magistrate's determination of probable cause, see Anthony, 451 Mass. at 69, and given the preference accorded to searches pursuant to warrants, see Commonwealth v. Germain, 396 Mass. 413, 418 (1985), we conclude that the affidavit established a substantial basis, and thus probable cause, to conclude that the defendant committed the crime. We also conclude that the affidavit established that the defendant had a cellular telephone and that it was in use around the time of the murder. Accordingly, the affidavit established probable cause to believe that the CSLI from the defendant's cellular telephone would provide evidence of his involvement in the crime. The CSLI should not have been suppressed.

D. Probable cause with respect to contact information. The Commonwealth also appeals from the suppression of "contact information," insofar as that term could be understood to

include the defendant's name, address, and related information in the subscriber and call records obtained by an administrative subpoena.

We note that the search warrant did not require the provider to produce contact information, nor does the warrant return indicate that any such information was obtained. To the extent the provider produced contact information, such as an address book or contact list, in response to the search warrant, the judge properly suppressed that information. The affidavit failed to establish a nexus between the crime and the defendant's contact information. To the extent the order can be understood as suppressing subscriber information or call records, which were first obtained by an administrative subpoena, there was no basis for suppression. See Augustine I, 467 Mass. at 243-244 & n.27 (no constitutionally protected privacy interest in telephone billing records and call details).

Conclusion. We reverse the order allowing the defendant's motion to suppress with respect to CSLI and to the extent that the order suppressed subscriber information or call records. The order is otherwise affirmed.

So ordered.